**FILED**

AUG -5 2016

~~[signature]~~ CLERK

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH DAKOTA
## NORTHERN DIVISION

| | | |
|---|---|---|
| ROCK ARNOLD, INDIVIDUALLY, ROCK ARNOLD AS REPRESENTATIVE OF RACOTA VALLEY RANCH PARTNERSHIP, RACOTA VALLEY RANCH PARTNERSHIP, BRYAN NELSON, INDIVIDUALLY, BRYAN NELSON AS REPRESENTATIVE OF NELSON FAMILY FARM, LLC, AND NELSON FAMILY FARM, LLC | § § § § § § § § § § § | |
| Plaintiff[s], | § § § | |
| vs. | § § § § | CIVIL ACTION NO. _16-1034_ (JURY REQUESTED) |
| SYNGENTA CORPORATION; SYNGENTA CROP PROTECTION, LLC; and SYNGENTA SEEDS, INC. | § § § § | |
| Defendants. | § | |

## PLAINTIFF[S]' ORIGINAL COMPLAINT

Plaintiff[s] Rock Arnold, Individually, Rock Arnold as Representative of Racota Valley Ranch Partnership, Racota Valley Ranch Partnership, Bryan Nelson, Individually, Bryan Nelson as Representative of Nelson Family Farm, LLC, and Nelson Family Farm, LLC, (collectively, "Plaintiff") files this their Original Complaint against Defendants Syngenta Corporation, Syngenta Crop Protection, LLC, and Syngenta Seeds, Inc., (collectively, "Syngenta") and in support thereof, would respectfully show the Court as follows:

### I.
### PARTIES

1.1   Plaintiffs are located in Clark County, South Dakota, which is located within this judicial district. At all relevant times, Plaintiffs were and still are citizens of the state of South

1

Dakota. Plaintiffs were engaged in the business of planting, growing, harvesting, gathering, distributing, and/or selling corn within this judicial district and the state of South Dakota. Plaintiffs' income results from the sale of corn at the publicly-determined market price. Plaintiffs have been damaged by: (1) Syngenta's release of Viptera corn into the U.S. corn and corn seed supply, which destroyed the export market of U.S. corn to China and other countries and depressed prices for all domestic corn; (2) Syngenta's materially misleading statements and/or failure to disclose the truth relating to the approval status of MIR162 in China and the impact that the lack of approval would have on the US Corn prices market; and (3) Syngenta's widespread contamination of the U.S. corn and corn seed supply with MIR162, which will continue to foreclose the U.S. export market to China in future years and will continue to lead to lower corn prices per bushel in the U.S. market. For diversity of citizenship purposes, Plaintiffs are citizens of the state of South Dakota.

1.2     Defendant Syngenta Corporation is a Delaware corporation with a principal place of business at 3411 Silverside Road, #100, Wilmington, Delaware, 19810. Syngenta Corporation may be served through its registered agent, The CT Corporation System, 319 South Coteau Street, Pierre, South Dakota 57501. This Defendant does business in this state and in this judicial district, and derives substantial profits from its sales in this state and in this judicial district. For diversity of citizenship purposes, this Defendant is a citizen of the states of Delaware and Minnesota.

1.3     Defendant Syngenta Crop Protection, LLC, is a limited liability company organized and operating under the laws of the State of Delaware, with its principal place of business at 410 Swing Road, Greensboro, North Carolina, 27409. Syngenta Crop Protection may be served through its registered agent, The CT Corporation System, 319 South Coteau Street, Pierre, South Dakota 57501. This Defendant does business in this state and in this judicial district, and derives substantial profits from its sales in this state and in this judicial district. For diversity of citizenship purposes, this Defendant is a citizen of the states of Delaware and North Carolina.

1.4     Syngenta Seeds, Inc. is a Delaware corporation doing business under the name of Novartis Seeds, Inc., with its principal place of business at 11055 Wayzata Blvd., Minnetonka, Minnesota, 55305. Syngenta Seeds, Inc. may be served through its registered agent, The CT Corporation System, 319 South Coteau Street, Pierre, South Dakota 57501. This Defendant does business in this state and in this judicial district, and derives substantial profits from its sales in this state and in this judicial district. For diversity of citizenship purposes, this Defendant is a citizen of the states of Delaware and Minnesota.

## II.
## JURISDICTION AND VENUE

2.1     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1332, and 15 U.S.C. § 1125(a) (Lanham Act) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

2.2     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because this action, which has a controversy in excess of $75,000, is between citizens of different states. No Plaintiff and Defendants are citizens of the same state and, therefore, complete diversity of citizenship exists between the parties and federal diversity jurisdiction exists because the amount in controversy exceeds the minimal jurisdictional limit of $75,000, exclusive of expenses, fees, and costs.

2.3     This Court has personal jurisdiction over Defendants because Defendants regularly and systematically conduct business within this state and judicial district, including the marketing and sale of Viptera, Duracade, and other corn-related products to farmers. As such, the exercise of personal jurisdiction over these Defendants does not offend the traditional notions of fair play and substantial justice.

2.4     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants have and continue to market, sell, or otherwise disseminate Viptera, Duracade, and other corn-related products within this judicial district.

## III.
## NATURE OF THE ACTION

3.1     Corn production is of crucial economic importance to the United States. The U.S. is ranked first in the world in total corn production and exports a significant amount of its production.

3.2     The U.S. corn marketing system is commodity-based. That means that, the corn grown and traded by Plaintiff, is harvested, gathered, commingled, consolidated, and otherwise shipped from thousands of farms to local, regional, and terminal distribution centers (commonly known as silos and elevators). From there, it is often consolidated from smaller to larger regional distribution centers and, eventually, transported by exporters to foreign countries. In order to maintain the stability of the corn marketing and distribution system, it is vital that the U.S. corn supply and exports maintain the highest standards of purity and integrity, and that they are approved by all foreign market buyers.

3.3     Syngenta is, among other things, in the business of developing and selling, in interstate commerce, corn seed that includes certain genetically engineered traits. After development, Syngenta licenses its genetically-engineered corn seed to seed manufacturers, including Syngenta's subsidiaries, who then sell it to farmers.

3.4     In 2009, Syngenta released a genetically engineered corn trait, MIR162, into the U.S. market. Its first generation of MIR162 corn was known as "Agrisure Viptera" ("Viptera"). The second generation of Syngenta's MIR162 corn, "Agrisure Duracade" ("Duracade"), was released, sold, and distributed for planting in 2014.

3.5     Agrisure varieties have been genetically engineered to protect corn against damage from insects such as the corn borer and corn rootworm. While the seed has been approved by the

United States, Brazil, Argentina, and various other countries, Syngenta submitted the corn trait to the Chinese government for approval in March 2010, but it has not been approved for sale in that country.

3.6    China's growing population and middle class have created a significant demand for U.S. products. China, long a key importer of other U.S. crops, has now become a major corn buyer as well. According to the United States Department of Agriculture, China purchased an estimated 5,000,000 tons of U.S. corn in 2012/13, up from 47,000 tons in 2008, making China the third largest export market for U.S. corn. China was on track to meet or exceed these numbers in 2013/14.

3.7    MIR162 corn was not approved in China, and as of November 2013, China stopped importing U.S. corn when it detects traces of MIR162 in U.S. corn shipments. China eventually banned ALL imports of US corn, and countries joined in China's complete ban of all US corn. It was not until December 15, 2014, that China finally approved MIR162 corn and lifted the ban on all US corn shipments.

3.8    MIR162 corn was only planted on about 3% of U.S. acres for the last two seasons.

3.9    While only a very small percentage of U.S. farmers plant MIR162 corn, the level of MIR162 corn planted is too high to ensure that any shipment of U.S. corn will not be contaminated with trace amounts of MIR162 after corn has been commingled and consolidated for export.

3.10    Thus, as a result of China's prohibition on the importation of MIR162 corn, even in trace, low-level amounts, and Syngenta's decision to continue marketing MIR162 to a small minority of U.S. corn farmers – *the vast majority of* U.S. corn has been effectively excluded from what was previously the third-largest export market for U.S. corn, causing U.S. farmers significant damages as corn prices have dropped from the loss of China's export markets.

3.11    Moreover, although it knew that it lacked approval from Chinese authorities, Syngenta has misinformed farmers, grain elevators, grain exporters, and the general public into

believing that regulatory approval of MIR162 corn from China was imminent and that the lack of Chinese approval would not impact the corn market prices.

3.12    Syngenta's decision to bring Viptera to the market crippled the 2013/14 corn export market to China and caused damage to Plaintiff. Syngenta knew, or should have known, that releasing Viptera would lead to the contamination of U.S. corn shipments and prevent U.S. corn from being sold to export markets such as China, which had not granted regulatory approval to MIR162.

3.13    Following this widespread harm, Syngenta's decision to release Duracade – its second generation MIR162 corn hybrid – again illustrates that Syngenta has acted in reckless disregard of the consequences of inflicting widespread harm to the U.S. corn market. Syngenta's conduct, as further detailed herein, has caused lost sales and income to Plaintiff in excess of $75,000.

## IV.
## FACTUAL ALLEGATIONS

### A.    CORN CULTIVATION AND EXPORTS

4.1    *Zea mays L. subsp. mays*, known as maize throughout the world, and as corn in the U.S., is a member of the Maydeae tribe of the grass family, Poaceae. It is an annual plant with separate male and female flowers on each plant (monoecious) that requires human intervention for its seed dispersal and propagation.

4.2    Corn is predominantly a wind-pollinated outcrossing species. Transgenes in crops have the potential to move between sexually compatible populations, and more so in corn being a wind-pollinated plant with separate male and female flower bearing structures (inflorescences).

4.3    Corn is grown for animal feed, human food, vegetable oil, high fructose corn syrups, starch, fermentation into ethanol, and a multitude of industrial uses.

4.4    There are several types of corn grown in the U.S., with the major types including field corn, sweet corn, and popcorn. All are of the species *Zea mays* and can cross pollinate. Field

6

corn (also known as dent corn or simply, corn) occupies the majority of the corn acres in the United States.

4.5     The U.S. accounts for nearly 41% of global corn production. Corn is the largest crop grown in the U.S. in terms of both volume and value.

4.6     Corn grown for grain purposes accounts for almost one-quarter of the harvested crop acres in the U.S. This, according to the National Corn Growers' Association, accounts for more than 85 million harvested acres in 2012. The U.S. is ranked first in the world for corn production.

4.7     Corn is grown on more than 400,000 farms in the United States. The upper Midwest region of the U.S. provides an ideal combination of temperature, rainfall, and soil type for the cultivation of corn. The leading corn producing states are Illinois, Iowa, Minnesota, and Nebraska, which together accounted for more than half of the U.S.'s corn production in 2012. These states combined with Indiana, Ohio, Wisconsin, Missouri, Kansas, and Iowa account for 77% of the total annual U.S. corn production.

4.8     The U.S. corn marketing system is predominantly commodity-based. Corn from thousands of farmers is gathered, commingled, and shipped through local, regional, and terminal grain elevators. These elevators, and other corn storage and transportation facilities, are generally not equipped to test and segregate differing corn varieties due to the costs associated with such a time-consuming process.

4.9     The U.S. exports about 20 percent of its domestic corn production to other countries. In 2012, China served as the third-leading market for the export of U.S. corn, following Japan and Mexico, with 203 million bushels of U.S. corn exported. The U.S. is by far the world's largest exporter of corn, in recent years accounting for approximately 68% of global exports.

**B.     SYNGENTA'S DEVELOPMENT OF VIPTERA CORN**

4.10    Syngenta developed MIR162 in order to make corn that is resistant to the feeding damage caused by corn earworm (*Helicoverpa zea*), fall armyworm (*Spodoptera frugiperda*), black cutworm (*Agrotis ipsilon*), and western bean cutworm (*Striacosta albicosta*) larvae.

4.11    This insect resistance in MIR162 comes from a bacterial gene called Vip3Aa20 (Vip = Vegetative insecticidal protein). The MIR162 corn also contains manA gene from *E. coli* encoding the enzyme phosphomannose isomerase ("PMI"), which was used as a selectable marker during transformant selection. The manA gene expression confers no other benefit to the regenerated transformed corn plant.

4.12    The family of Vip3Aa proteins, in which Vip3Aa20 belongs, are produced by the bacterium *Bacillus thuringiensis* ("*Bt*") that act as toxins to kill insects. Within the corn-biotechnology industry, corn which is manipulated in this fashion is commonly referred to as "*Bt corn*."

4.13    Viptera's insecticidal protection comes from the Vip3A protein, which binds to the insect and forms pores, killing the insect before further crop damage occurs. The specific genetic material inserted into the genome of Viptera corn allows the genetically modified corn to produce certain proteins, including CrylAb, mCry3A, and Vip3A. These proteins have insecticidal properties which, according to Syngenta, can control "more insects than any other trait stack on the market."

4.14    Syngenta invested approximately $200 million and spent five to seven years developing Viptera corn.

4.15    As a bio-engineered product, Viptera corn was subject to U.S. regulatory approval prior to cultivation and sale. In April 2010, Syngenta announced it had received deregulation from the USDA for the Agrisure Viptera trait. Syngenta's press release stated that the Viptera trait "has demonstrated unsurpassed multi-pest control of 14 yield-and quality-robbing insects."

4.16    Following its approval in spring 2010, Syngenta made the decision to release Viptera corn commercially for the 2011 growing season through product names such as Agrisure Viptera

8

3110 & 3111. This was sold through its seed partners Golden Harvest®, Garst®, NK®, and additional independent retailers. Although the U.S. Department of Agriculture had deregulated the trait, Syngenta released Viptera corn into the market even though it lacked regulatory approval from certain key import markets such as China, Japan, and the European Union.

4.17    While Japan and the European Union have since approved the Viptera corn trait for import, China's regulatory authorities have not granted approval, despite Syngenta's repeated assurances to the contrary that approval was forthcoming. Even with China's approval stalled, Syngenta still encourages farmers to grow Viptera and Duracade corn, while downplaying and misrepresenting the risks of the foreclosure of the Chinese market, through the advertisements and public statements described herein.

4.18    Viptera corn is protected by Syngenta patents, giving Syngenta the right to exclude others from selling products with the Viptera corn traits. Syngenta thus is motivated to maximize its period of exclusivity when no other seller can sell Viptera. Syngenta has pushed its product on farmers, prior to import approval from China, to enhance its profit margin before other competitors could sell the product.

4.19    In September 2014, Syngenta announced 52 new corn hybrids for the 2015 growing season in the United States. The Agrisure Viptera trait is featured in 23 of the new hybrids, and the Agrisure Duracade trait is incorporated into 18 of the new hybrids. Syngenta has promoted these hybrids by representing that they "protect corn crops" and offer "the latest corn rootworm technology." Syngenta has continued to market these hybrids to farmers even without Chinese approval.[1]

4.20    China, having not approved the importation of Viptera corn, maintains a zero-tolerance policy regarding contamination of corn imports with corn containing MIR162. This means

---

[1] *See* "Syngenta Announces 52 New Corn Hybrids for 2015 Season," Sept. 17, 2014, available at: http://www.agprofessional.com/news/Syngenta-announces-52-new-corn-hybrids-for-2015-season-275494841.html.

that any detection of MIR162 in a shipment to China could result in the rejection of the entire shipment. Syngenta had knowledge of China's zero-tolerance policy prior to the commercialization and release of Viptera corn.

### C.    CONTAMINATION OF THE U.S. CORN SUPPLY

4.30    After Viptera received U.S. regulatory approval, Syngenta offered farmers a "side-by-side program" which encouraged farmers to plant Viptera corn adjacent to other corn seed.

4.31    Syngenta encouraged this side-by-side planting process despite the known contamination risks in doing so. Syngenta knew that commingling different varieties of corn is a risk during the planting, harvesting, drying, storage, and transportation process. Once released, a corn variety will, without adequate precautions, contaminate the broader corn supply.

4.32    By promoting the side-by-side program, Syngenta helped spread the amount of MIR162 that would appear in the U.S. corn supply, thus putting exports to countries that had not approved the trait (such as China) at risk.

4.33    Syngenta also knew, or should have known, that commingling would result in Chinese regulatory officials rejecting shipments of U.S. corn.

4.34    Moreover, corn replicates by cross-pollination from one plant to another. Pollen from corn has been demonstrated to drift over considerable distances and cross-breed with corn from other plants. The corn resulting from this cross-pollination can express traits from the pollen-donating plant.

4.35    This pollen can travel 200 feet through cross pollination. Some studies have found that cross-pollination cannot be eliminated, even at a distance of one-third of a mile.[2]   In 2003, farmers who did not plant StarLink and who had suffered economic losses due to depressed corn

---

[2] Studies have found that "even if only a small percentage of the total pollen shed by a field of corn drifts into a neighboring field, there is considerable potential for contamination See Peter Thomison, Managing Pollen Drift to Minimize Contamination of Non-GMO Corn, available at http://ohioline.osu.edu/agf-fact/0153.html.

prices following the StarLink recall settled a class-action lawsuit against Aventis for over $100 million.[3] Thus, without adequate precautions, neighboring corn fields will exchange pollen.

4.36    As a leader in the field of corn biotechnology, Syngenta understood the effects of contamination by cross-pollination at the time it chose to release Viptera corn.

4.37    In its "Agrisure Traits Stewardship Guide," Syngenta recognized that cross-pollination is a "normal occurrence in corn production" and that achieving 100 percent of purity of seed or grain is impossible in any corn production system.

4.38    Notably, this is not the first time biotechnology companies have had problems with export markets rejecting genetically engineered corn. In September 2000, it was reported that some taco shells sold in retail stores contained a protein from Aventis' genetically engineered StarLink corn, which was approved only for feed and non-food industrial uses but not for human consumption.

4.39    This discovery led to the recall of numerous food products and a corn buyback program. Due to foreclosure of corn export markets, the StarLink recall also depressed domestic corn prices.

### D.    GRAIN ELEVATORS REFUSAL OF VIPTERA CORN

4.40    After the 2011 planting season, Bunge North America, Inc., a grain elevator and handler based in St. Louis, Missouri, posted signs and distributed materials stating that Viptera corn would not be accepted during the 2011 harvest season.

4.41    Bunge cited the lack of Chinese import approval as its reason for not accepting Viptera corn.

4.42    In response, Syngenta sued Bunge in federal court, *Syngenta Seeds, Inc. v. Bunge North America, Inc.*, No. C 11-4074-MWB (N.D. Iowa) (Bennett, J), seeking preliminary and permanent injunctions requiring Bunge to stop posting materials regarding its refusal to accept

---

[3] *Id.*

Viptera corn. The lawsuit also sought an injunction which would have required Bunge to accept Viptera corn at its facilities.

4.43    Bunge replied to the lawsuit by stating that its decision not to accept Agrisure Viptera corn was consistent with the North American Export Grain Association's policy to advocate that technology providers receive all major international approvals for a trait prior to seed sales. Bunge stated that Syngenta had undertaken an action which could put at risk a major export market for U.S. corn (China).

4.44    Syngenta's request for a preliminary injunction was denied, several of Syngenta's claims were dismissed on the pleadings while others were voluntarily dismissed, and on appeal, dismissal was affirmed in part, with Syngenta's action remanded to determine whether Syngenta had standing under the zone-of-interests test and proximate causality requirement for asserting a Lanham Act claim related to Bunge's posting of its policy to reject Viptera corn at its elevators. The remanded action remains pending.

4.45    Major grain handlers, such as Bunge, Archer Daniels Midland, Cargill, and others still refuse to accept Viptera corn, because preventing commingling is essentially impossible.

**E.    CHINA'S REJECTION OF U.S. CORN SHIPMENTS**

4.46    China was the seventh largest corn import market for the 2009-10 crop year with widespread predictions that it would move into the top five by 2011-12. By 2013/14, China had moved into the top 3 export markets for U.S. corn. However, corn trade between the United States and China declined drastically in January 2014 after the trade disruption resulting from detection of MIR162.



4.47    On or about November 2013, Chinese regulatory officials began rejecting cargo shipments of U.S. corn after the shipments tested positive for the trace presence of Viptera corn.

4.48    On December 24, 2013, the General Administration of Quality Supervision, Inspection and Quarantine of China issued a warning notification strengthening the inspection and supervision for the import of GMO feed materials. This notification stated the impetus was that Shanghai Chinese Inspection and Quarantine Service had detected MIR162. The notification stated that all batches of corn would now be tested at Chinese ports for MIR162, and that any cargo that tested positive would be returned or destroyed.

4.49    After this notification, all U.S. corn exports were put at risk.

4.50    The decision to test corn exports at Chinese ports caused some Chinese customers to refuse to honor their contracts to purchase corn, and it also injected a great deal of uncertainty into the market.

4.51    Since November 2013, Chinese imports for U.S. corn have decreased by an estimated 85 percent. As a result, domestically, corn prices have fallen considerably downward. These effects resulted from the fact that each export contract is at risk.

4.52    China strengthened its policy regarding MIR162 again in July 2014, after an increasing number of U.S. corn shipments began testing positive.

4.53    This market shift comes as China was projected to import a record high 7,000,000 tons of U.S. corn, according to the U.S. Department of Agriculture.

4.54    Syngenta knew, or should have known, that disruption to the Chinese import market would influence the global corn market, that contracts between grain exporters and Chinese corn buyers would be negatively affected if MIR162 was found in grain exports to China, and that U.S. farmers would suffer damages if these contracts were placed at risk, in the form of a declining market and a lower sale price per bushel of corn.

**F.    SYNGENTA'S MISREPRESENTIONS REGARDING THE CORN EXPORT MARKET, GENETICALLY MODIFIED CORN, AND THE STATUS OF CHINESE MIR162 APPROVAL**

4.55    Syngenta has repeatedly attempted to downplay and misrepresent the significance of the export market for corn on U.S. corn prices, China's key role in the U.S. export market, and the timing of Chinese approval of MIR162. Syngenta did this with the intention of encouraging farmers to continue to buy and plant its MIR162 corn.

4.56    For example, Syngenta published a "fact sheet" on its website about Viptera called "Plant with Confidence," which is directed at farmers. Syngenta's fact sheet engages in direct misrepresentations about U.S. corn exports.

4.57    In order to convince farmers that the loss of key export markets was unimportant, Syngenta's "Plant With Confidence" marketing materials states that "in the last five years, on average, only about 13 percent of U.S. corn has been exported." Additionally, Syngenta claims "the vast majority of corn produced in the U.S. is used domestically."[4]

---

[4] *See* Agrisure Viptera "Plant With Confidence" Fact Sheet,
http://www.syngenta-us.com/viptera exports/images/Agrisure-Viptera-Fact-Sheet.pdf.

4.58    The USDA Economic Research Service, however, has reported that approximately 20 percent of U.S. corn is exported to other countries and touts the U.S. as "a major player in the world corn trade market."[5]

4.59    Furthermore, Syngenta's "Plant With Confidence" fact sheet attempts to downplay the importance of China as an export market for U.S. corn. The fact sheet states that China has imported, on average, a little more than half of one percent (0.5%) of all U.S. corn produced in the past five years. Syngenta's fact sheet also states that "traditional major markets are legally able to accept Agrisure Viptera grain," which implies that China is not a traditional major market.

4.60    Syngenta's misrepresentations contradict the statistics reported by the USDA, which state that China serves as the third-largest export market for U.S. corn. Moreover, while historically (prior to 2008) China was not a significant importer of U.S. corn, Syngenta knew that by 2010, China was projected to be a top-five importer of U.S. corn.

4.61    In another document entitled "Agrisure Viptera & China Import Approval FAQs" dated January 2014, Syngenta makes additional misrepresentations about China's lack of approval of Viptera suggesting that China was avoiding approval of Viptera as a pretext to encourage consumption of domestic Chinese corn.[6]

4.62    Further despite acknowledging that the *earliest* China might approve Agrisure Duracade corn would be March 2015, Syngenta stated that it intends to proceed with commercializing and selling this corn.[7]

4.63    Syngenta also knew the significant damage that U.S. farmers would experience as a result of the rejection of corn by China, yet continued to downplay and misrepresent the importance of this lost market.

---

[5] *See* USDA Economic Research Service (Figures Updated May 2014), at http://www.ers.usda.gov/topics/crops/corn/background.aspx#.VCGNPfldU2s.
[6] www.syngenta-us.com/viptera_exports/images/Right_to_Grow_QA.pdf
[7] *Id.*

4.64    For example, in the lawsuit that Syngenta brought against Bunge, as previously described herein, unrebutted evidence indicated that redirection costs for a rejected shipment of corn contaminated with the MIR162 trait could cost between $4 million to $20 million for a single shipment. *See Syngenta Seeds, Inc. v. Bunge North America, Inc.*, No. 5:11-cv-04074- MWB, (N.D. Iowa Sept. 26, 2011) ECF No. 42, at 12.

4.65    In Syngenta's 2010 Full Year Results, CEO Michael Mack acknowledged that Chinese "import requirements alone influence global commodity prices."

4.66    In Syngenta's 2011 Half Year Earnings Report, Mr. Mack remarked on the importance of the Chinese market, stating that China "continues to have the greatest impact on world markets, with increasing imports not just of soybeans but also now of corn." This is contrast to what Syngenta was telling farmers (and continues to do so).

4.67    Syngenta also repeatedly suggests that approval of MIR162 would happen imminently.

4.68    For example, in response to a question during the 2012 first quarter earnings conference call regarding the status of Chinese approval of Viptera, Mr. Mack stated: "[t]here isn't outstanding approval for China, which we expect to have quite frankly within the matter of a couple days . . . we know of no issue with that whatsoever . . . ."

4.69    Mr. Mack's statement was publicized sufficiently to constitute promotion within the grain industry. This statement dangerously impacted the corn market by encouraging (1) farmers to plant MIR162 without worrying about their ability to sell the corn to grain elevators, (2) grain elevators to accept and commingle MIR162 with other grains, and (3) exporters to purchase and ship products containing MIR162 without concerns that the shipments would be rejected in China.

4.70    Similarly, in the *Bunge* proceedings, Syngenta told the Court that it anticipated receiving approval for MIR162 in China by March 2012.

4.71    By 2014, Syngenta knew, or should have known, that China was no closer to approving MIR162, especially as the timing grew closer to the 2014 planting season. Mr. Mack stated during a conference call that "I think it is fair to say at this point in time that we don't have – that we will not have any approval before the start of the season. That's for sure." But what Syngenta told to outside investors, it failed to disclose to farmers.

4.72    During Syngenta's second quarter 2014 earnings conference call, Mr. Mack stated that the delay of approval from Chinese authorities "is a regulatory matter in China as opposed to any regulatory matter with Syngenta. The delays coming out of China are such that people just aren't really understanding right now even what the process is."

4.73    This statement, and others, underscored the fact that Syngenta recognized that they were no closer to gaining import approval from China. Still, Syngenta continues to sell MIR162 products, as well as launch new genetically modified products, none of which have been approved by China – and continues to downplay the importance of the Chinese export market. In continuing with this conduct, Syngenta knows, or should know, that it will continue to negatively impact the U.S. market for corn exports to China.

4.74    Despite these statements in 2014 expressing uncertainty as to when China would grant approval, Syngenta also misled and continues to mislead exporters into believing that products containing MIR162 will be accepted in China.

4.75    For example, on its website, Syngenta offered information about the status of Chinese import approval. The website stated that Syngenta was attempting to "expedite import approval of MIR162" and that Syngenta's Duracade technology is "under active review." Notably, the "China Grain Import Situation" website failed to acknowledge that shipments of U.S. corn to China have been halted due to fears of contamination with MIR162.[8]

---

[8] *See* "China Grain Import Situation" at http://www.syngenta-us.com/viptera exports/.

4.76    On its website, Syngenta offered a form entitled: "Request Form for Biosafety Certificates Issued by Chinese Ministry of Agriculture."[9] The form stated that the certificates for the following transgenic events were issued to Syngenta Seeds by the Ministry of Agriculture, and one of the transgenic events identified on the form was MIR162.

4.77    Moreover, the form stated that "The Biosafety Certificate(s) provided allows importation of the above marked corn products as raw materials for processing for food and feed use only, not for any research purpose or cultivation purpose."

4.78    The form and corresponding language appeared to emphasize that if an exporter completed the form, Syngenta would then issue a Biosafety Certificate, which would allow the cargo to enter China. The form thus contained misleading implications because it did not state that any products with MIR162 would be rejected.

4.79    Thus, Syngenta's request form was released as an advertisement for Viptera corn, as it indicates that products containing MIR162 may be imported into China if the form is correctly filled out.

4.80    Syngenta included MIR162 on this request form, even though Syngenta knew that MIR162 was not approved for import into China, based on economic motivations, including the continued sales of Viptera corn.

4.81    Syngenta's request form was disseminated sufficiently to constitute promotion within the seed sales industry.

4.82    The statements made by Syngenta officials, including by Mr. Mack, as described above, illustrate that Syngenta knew that MIR162 had not been approved for import into China, even though other corn products/transgenic events identified on the form had been approved.

---

[9] The request form is available at:
www.3syngenta.com/country/us/en/agriculture/Stewardship/Documents/ChinaSafetyCertificateApplication.pdf.

4.83    More than two years have passed since the earnings conference call where Syngenta's CEO expressed that approval was days away, and yet, MIR162 still has not been approved in China until December of 2014 when the MIR162 finally received China's approval.

### G.    THE IMPACT OF SYNGENTA'S CONDUCT.

4.84    In a question about whether Syngenta would insure farmers from losses caused by Viptera rejection in China during a 2014 first quarter conference call, Mr. Mack replied: "[F]armers don't have any exposure whatsoever to Chinese corn rejection. When they sell their corn into an elevator, the elevator then sells it on to a grain trader where, if and where there is any financial exposure from a rejection, that's between the two parties, the importer and the exporter of corn. The farmers don't involve themselves in that. So with respect to indemnifying a farmer, backstopping their losses, there's no need for Syngenta to do that because the farmer doesn't have any exposure to that."

4.85    To the contrary, losses to U.S. corn farmers as a result of Syngenta's activities have been staggering.

4.86    The National Grain and Feed Association (NGFA) found that Chinese rejection of U.S. corn, which resulted solely from concerns that MIR162 had infiltrated the entire U.S. corn supply, have lowered corn prices by 11 cents per bushel, leading to a projected loss of **$1.14 billion** for the last nine months of the marketing year ending on August 31, 2014.

4.87    Overall, corn exports for the 2013-14 marketing year totaled 46,867,700 metric tons, which amounted to 4 percent *less* than the U.S. Department of Agriculture's projection of 48,770,000 metric tons, according to USDA figures released in September 2014.

4.88 The NGFA has called on Syngenta to stop selling the genetically modified corn varieties until the varieties can be sold in major export markets, such as China.

4.89    In a joint statement with the North American Export Grain Association (NAEGA), NGFA also requested that Syngenta stop the release of Duracade corn, stating: "NAEGA and NGFA

are gravely concerned about the serious economic harm to exporters, grain handlers and, ultimately, agricultural procedures – as well as the United States' reputation to meet its customers' needs – that has resulted from Syngenta's current approach to stewardship of Viptera. Further, the same concerns now transcend to Syngenta's intended product launch plans for Duracade, which risk repeating and extending the damage. Immediate action is required by Syngenta to halt such damage."

4.90    Instead of agreeing to this request, Syngenta is proceeding with plans to expand upon its limited release of Duracade – a new type of genetically modified corn, which also is not yet approved in China. One NGFA official stated that this new gene is also likely to show up in exports, further exacerbating problems with China and other nations that have not granted approval, but that Syngenta remains motivated by its profit margin. "They're being a bad actor here," Max Fischer of NGFA said, referring to Syngenta. "They're making $40 million" selling the new corn varieties, "but it's costing U.S. farmers $1 billion."

4.91    Upon information and belief, Viptera corn accounts for approximately 25% of Syngenta's corn portfolio. In 2013, Syngenta's corn sales totaled more than $3.5 billion.

4.92    In addition to falling prices for corn, Plaintiff has been damaged in other ways as a result of Syngenta's reckless decision to sell and distribute genetically modified corn seeds without receiving import approval from China. As further detailed herein, U.S. grain companies cannot put themselves at risk of having an unmarketable product when their blended corn arrives at export terminals. Thus, U.S. grain companies are asking farmers to ensure that Viptera and Duracade corn traits are completely removed from their deliveries.

4.93    Thus, farmers must segregate different types of corn on their farms until the regulatory concerns are resolved. The National Corn Growers Association has urged farmers to recheck their seed plots on farms or contract with a third party to verify that corn with unapproved traits, such as MIR162, have not infiltrated the overall export supply.

4.94     No matter how careful farmers are in separating their grain, such contamination still can happen in multiple ways, including accidental mixing and cross-pollination by bees or wind. Farmers are being instructed to thoroughly clean out their grain legs, augers, grain carts, and any other equipment that is used to harvest corn containing the Viptera and Duracade traits.

4.95     Syngenta knew, or should have known, before it disseminated corn with the MIR162 genetic trait, that such cross-pollination could not be prevented despite farmers' best efforts. Syngenta knew, or should have known, that the U.S. corn production and marketing chain is a commodity-based system that gathers, commingles, and ships corn from thousands of farms, and that widespread commingling of genetically modified corn with non-genetically modified corn could not be completely prevented.

## V.
## CLAIMS FOR RELIEF

### COUNT I

**VIOLATION OF LANHAM ACT – 15 U.S.C. § 1125(a)(1)(B)**

5.1     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

5.2     The Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part:

(1)     Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

(2)     in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

5.3     Syngenta used and/or continues to use in commerce false or misleading descriptions of fact, and/or false or misleading representations of fact, which were likely to cause and/or did cause confusion and mistake.

5.4    Specifically, Syngenta's statements and commentary made to the press, statements on the Internet including, but not limited to, the statements on its "Plant With Confidence" fact sheet, in its frequently asked questions, during quarterly conference calls, and incorporated into Syngenta's forms, which represent that Viptera corn is or would imminently be approved for import into China, as alleged above, are materially false statements that are, and continue to be, likely to cause confusion and mistake as to the nature, characteristics, and qualities of Viptera corn.

5.5    Syngenta's misleading representations of fact relating to the U.S. corn export market, and particularly in relation to China's position as a major export market, also deceived and/or continue to deceive farmers and other consumers. Syngenta's "Plant With Confidence" fact sheet has, and is likely to continue, to cause confusion and mistake as to the percentage of U.S. corn exported to China on an annual basis, among other facts.

5.6    Additionally, Syngenta's representations deceived and/or continue to deceive farmers and other consumers as to the approval of their goods (namely Viptera and Duracade corn).

5.7    Syngenta's Viptera and Duracade corn products caused, and/or were likely to cause, customer confusion regarding the approval of the products from foreign regulatory authorities, including the Chinese government.

5.8    Yet, Syngenta has used and/or continues to use false representations regarding the approval of Viptera and Duracade corn to capture business, increase sales, and enhance products.

5.9    Syngenta's statements were made as an advertisement for Viptera corn.

5.10    Syngenta's statements specifically refer to Viptera corn.

5.11    Syngenta had an economic motivation for making its statements, as Syngenta was incentivized to sell its Viptera corn product.

5.12    Syngenta's statements were likely to influence purchasing decisions by domestic corn producers.

22

5.13    Syngenta's statements were widely distributed, which is, at least, sufficient to constitute promotion within the grain industry.

5.14    Thus, upon information and belief, Syngenta's misleading representations are and/or were material.

5.15    Syngenta's products travel or traveled in interstate commerce.

5.16    Plaintiff was damaged by Syngenta's material misrepresentations. Indeed, Plaintiff was injured and/or continues to be injured by declining sales, lost profits, loss of reputation, and other injuries.

5.17    Plaintiff's damages were proximately caused by Syngenta's misleading representations as described herein.

5.18    Syngenta's acts constitute the use of false descriptions and false representations in interstate commerce in violation of § 43(a) of the Lanham Act and entitle Plaintiff to recover damages, the costs of this action, and reasonable attorneys' fees.

<u>**COUNT II**</u>
**PUBLIC NUISANCE**

5.19    Plaintiff repeats and realleges the above paragraphs as fully set forth herein.

5.20    Through the conduct alleged above, Syngenta has created a public nuisance by causing widespread contamination of the U.S. corn supply with the MIR162 trait.

5.21    This conduct constitutes an unreasonable and substantial interference with rights common to the general public.

5.20    This unreasonable interference is imposed on the community at large and on a considerable diverse number of persons and entities. It arises from Syngenta's testing, growing, storing, transporting, selling, disposing, or otherwise disseminating Viptera corn: (a) without adequate precautions to prevent contamination of the U.S. corn and corn seed supplies; (b) with the knowledge that Viptera corn would contaminate other corn; (c) with the knowledge that this

contamination would likely affect the U.S. corn and corn seed supplies; or (d) with the knowledge that there was a substantial risk of contamination of corn and corn seed supplies earmarked for export.

5.22    This interference is unreasonable in that it involves a significant interference with the public health, public safety, public peace, public comfort, and/or the public convenience. It is also unreasonable in that as proscribed by law, is of a continuing nature and has produced a permanent or long-lasting effect.

5.23    Plaintiff suffered harm caused by Syngenta's public nuisance, distinct from and different than that suffered by the general public in that, as described above, they have suffered business losses in the form of, among other things, the rejection of their crops by certain export markets (namely China); wrongful rescission of sales contracts; reduced or restricted demand for their products and services in certain markets; and reduced prices for their products and services in markets still utilizing their products and services.

5.24    Syngenta knew, or should have known, that its conduct would naturally result in injuries and damages to Plaintiff. Nevertheless, Syngenta continued such conduct in reckless disregard of or conscious indifference to those consequences.

## COUNT III
### TRESPASS TO CHATTELS

5.25    Plaintiff repeats and realleges paragraphs 1-145 as fully set forth herein.

5.26    Plaintiff entered into contracts for the sale of corn.

5.27    As previously described herein, Syngenta, by testing, growing, storing, transporting, selling, disposing, or otherwise disseminating Viptera corn, has contaminated the U.S. corn supply.

5.28    The contamination of the corn supply from the MIR162 trait has negatively impaired the condition, quality, or value of the U.S. corn supply.

5.29    Plaintiff, due to the loss of markets and the decline of corn prices, was damaged in an amount to be proven at trial as a direct and proximate result of Syngenta's wrongful conduct.

5.30    Syngenta's actions, including the growing, testing, storing, transporting, selling, disposing, or otherwise disseminating Viptera corn, which led to the market-wide contamination, have harmed Plaintiff's economic interests.

### COUNT IV
### NEGLIGENCE

5.31    Plaintiff repeats and realleges the above paragraphs as set forth herein.

5.32    With respect to its testing, growing, storing, transporting, selling, disposing, or otherwise disseminating Viptera corn, Syngenta had a duty to use its professional expertise and exercise the degree of skill and learning ordinarily used under the same, or similar, circumstances by a person or entity in Syngenta's business.

5.33    Syngenta breached this duty by failing to exercise the requisite degree of care in testing, growing, storing, transporting, selling, disposing or otherwise disseminating Viptera corn to prevent it from contaminating the U.S. corn supply.

5.34    Upon information and belief, Syngenta breached its duty by failing to notify the appropriate regulatory bodies and the public in a timely fashion after it first learned of the contamination of the U.S. corn supply with MIR162.

5.35    The damages incurred by Plaintiff was, or should have been, foreseen by Syngenta, as Syngenta was uniquely positioned to understand the risks of releasing Viptera corn, including but not limited to, the near certainty of cross-pollination, risks of intentional or unintentional commingling of Viptera corn with non-Viptera corn, China's zero-tolerance policy for MIR162, and China's large – and growing – U.S. corn import market.

5.36    Syngenta breached its duties, as alleged above, and also breached the requisite standard of care owed to all foreseeable plaintiffs, and was therefore negligent.

5.37    Syngenta's breaches are a direct and proximate cause of the injuries and damages sustained by the Plaintiff.

<u>**COUNT V**</u>

**TORTIOUS INTERFERENCE WITH
PROSPECTIVE BUSINESS RELATIONSHIPS**

5.38    Plaintiff repeats and realleges the above paragraphs as set forth herein.

5.39    Plaintiff had a business relationship with various grain elevators, co-ops, and supply companies whereby Plaintiff would sell their corn to such companies. This business relationship was memorialized by invoices, receipts, and other documents showing a consistent course of sales.

5.40    Plaintiff had a reasonable expectation of economic gain resulting from the relationship with these grain elevators and supply companies, and Plaintiff reasonably expected to continue to sell corn from their farm to such companies. Thus, Plaintiff rightfully maintained the expectation that such business relationships would continue in the future.

5.41    Defendant Syngenta knew that Plaintiff and other farmers had business relationships with such grain elevators and supply companies in the normal chain of crop export and sales, and Syngenta was fully aware that Plaintiff and other farmers expected these business relationships to continue in the future.

5.42    Despite this knowledge, Syngenta intentionally interfered with these relationships by making representations that deceived and/or continue to deceive farmers and other consumers as to whether grain elevators and other supply companies would accept Viptera and Duracade corn. These misrepresentations, which included a "Plant With Confidence" fact sheet on Syngenta's website and other various forms, stated that Viptera corn is or would imminently be approved for import into China. As a result of these representations, Plaintiff believed that growing Viptera and Duracade was commonplace and that their ability to sell such corn would not be impacted.

5.43     Syngenta intentionally interfered with these prospective future business relationships through its conscious decision to bring Viptera and Duracade corn to the market. Syngenta knew, or should have known, that the releasing MIR162 corn would lead to the contamination of all U.S. corn shipments and prevent U.S. corn from being sold to export markets such as China, which has not granted import approval.

5.44     Syngenta's release of MIR162 corn has destroyed the export of U.S. corn to China and caused depressed prices for all domestic corn producers. Thus, Plaintiff is unable to sell their corn to grain elevators and supply companies at the price they reasonably expected to receive.

5.45     Syngenta intentionally interfered with Plaintiff's prospective business relationships; and Syngenta knew the interference was certain or substantially certain to occur as a result of its conduct in releasing MIR162 corn into the U.S. market.

5.46     Plaintiff has been proximately damaged and continues to be damaged as a result of Syngenta's interference.

5.47     Syngenta's tortious conduct serves as a direct and proximate cause of the injuries and damages sustained by the Plaintiff.

## VI.
## PRAYER AND REQUEST FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, as follows:

(a)     That the Court enter a judgment ordering Syngenta to take affirmative steps to remediate the contamination that it has already caused;

(b)     That the Court enter a final judgment finding:

(1)     Syngenta falsely advertised Viptera corn under §43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

(2)     Syngenta's release of Viptera corn constitutes a public nuisance.

(3)     Syngenta's release of Viptera corn and the contamination of the U.S. corn supply constitutes a trespass to chattels.

27

        (4)      Syngenta's release of Viptera corn was negligent.

        (5)      Syngenta tortiously interfered with Plaintiff's prospective business relationship by releasing MIR162 corn into the U.S. market.

(c)      That the Court award monetary damages, including compensatory relief, to which Plaintiff is entitled to, in an amount to be determined at trial but exceeding $75,000.

(d)      That the Court award punitive/exemplary damages at the maximum amount allowed by law; and

(e)      That the Court award prejudgment interest, the costs of this action, and such other and further relief as the Court deems proper.

## VII.
## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

**WHEREFORE,** Plaintiff demands judgment against Defendant for compensatory and punitive damages; interest; trial by jury; for costs herein expended; and for any and all further relief to which the Plaintiff may appear entitled.

Respectfully submitted this 3rd day of August, 2016.

HOSSLEY – EMBRY, LLP


D. Allen Hossley
South Dakota State Bar 3800
9101 LBJ Freeway, Suite 450
Dallas, Texas 75243
Telephone: 214-265-1117
Facsimile:  214-265-1958
allen@hossleyembry.com

**ATTORNEYS FOR PLAINTIFFS**